L. SCOTT OLIVER (SBN 174824)
soliver@orrick.com
LILLIAN J. MAO (SBN 267410)
lmao@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025
Telephone: (650) 614-7400
Facsimile: (650) 614-7401

*Attorneys for Plaintiff Vendavo, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| VENDAVO, INC.<br><br>                    Plaintiff,<br><br>vs.<br><br>PRICE F(X) AG, PRICE F(X), INC., and DOES 1-10<br><br>                    Defendant. | Case No.: 17-cv-06930-RS<br><br>**AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br><br>**1.  MISAPPROPRIATION UNDER DEFENSE OF TRADE SECRETS ACT;**<br><br>**2.  PATENT INFRINGEMENT;**<br><br>**3.  COPYRIGHT INFRINGEMENT; AND**<br><br>**4.  UNFAIR COMPETITION.**<br><br><br>**JURY TRIAL DEMANDED**<br><br>Trial Date: None Set |

Plaintiff Vendavo, Inc. ("Plaintiff" or "Vendavo"), by and through its undersigned attorneys, alleges against Defendants Price f(x) AG and Price f(x), Inc. (collectively "PFX"), and DOES 1 through 10 (collectively "Defendants," and each a "Defendant") as follows:

## I.   PARTIES

1.     Plaintiff Vendavo, Inc. is a Delaware corporation with its principal place of business at 1401 17th Street, Suite 800, Denver, Colorado 80202.  Previously, and during the majority of the events alleged herein, Vendavo had its principal place of business at 401 East Middlefield Road, Mountain View, CA 94043.  Vendavo currently maintains an office at 2590 N. First Street, Suite 300, San Jose, California 95131.

2.     Price f(x), Inc. is an Illinois corporation with a principal place of business at 2 North 1st Street, 5th Floor, San Jose, California 95113.  Price f(x) has offices in San Jose, CA and Chicago, IL, as well as in the Czech Republic, Switzerland, and Hong Kong.  Price f(x) AG is a German corporation based in Munich, Germany.

3.     Vendavo is ignorant of the true names and capacities of the remaining defendants, sued as Does 1 through 10, and therefore sues defendants by such fictitious names.  Vendavo will amend this Complaint to allege true names and capacities when ascertained.  Vendavo is informed and believes, and on that basis alleges, that each of the fictitiously named defendants are in some manner responsible for the harm Vendavo has incurred and will incur if injunctive relief is not allowed or damages are not awarded.

## II.   JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over Vendavo's federal trade secret claim pursuant to 18 U.S.C. §§ 1836-39 *et seq*. and 28 U.S.C. § 1331.  This Court has subject matter jurisdiction over Vendavo's claims for patent infringement pursuant to the Federal Patent Act, 35 U.S.C. § 101 *et seq.*, and 28 U.S.C. §§ 1331 and 1338(a). This Court has subject matter jurisdiction over Vendavo's federal claim of copyright infringement pursuant to the Federal Copyright Act, 17 U.S.C. § 101 *et seq.*, and 28 U.S.C. §§ 1331 1338(a).

5.     This Court has supplemental subject matter jurisdiction over Vendavo's related state claims under 28 U.S.C. § 1367, as the state claims herein arise from the same case or controversy

which give rise to Vendavo's claims of trade secret misappropriation and patent and copyright infringement.

6.     This Court has personal jurisdiction over each Defendant because: each Defendant has minimum contacts within the State of California and this judicial district; each Defendant has purposefully availed itself of the privileges of conducting business in the State of California and in this judicial district; each Defendant regularly conducts business within the State of California and within this judicial district; and Vendavo's causes of action arise directly from each Defendant's business contacts and other activities in the State of California and in this judicial district.

7.     Defendants Price f(x) AG and Price f(x), Inc. carry on a unified business of developing and selling price management software.  For example, in marketing to and communicating with current and potential customers, in exhibiting at trade shows within the United States, and in supporting customers, Defendants do not distinguish among their various corporate entities.  Thus, the existence of Price f(x), Inc. is simply a formality that allows Price f(x) AG to conduct business in the United States.  The two entities have no material difference for purposes of the claims herein.  Because of Defendants' failure to separate their corporate operations, Vendavo makes its allegations herein against Price f(x) AG and Price f(x), Inc. collectively (hereinafter "PFX"), except where otherwise specified.

8.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this dispute and the damages sustained in this dispute have occurred, and are occurring, within this District.

## GENERAL ALLEGATIONS

### III.     VENDAVO PROTECTS ITS INTELLECTUAL PROPERTY THROUGH PATENT AND COPYRIGHT PROTECTION AS WELL AS POLICIES TO PROTECT TRADE SECRETS.

### A.     Vendavo Is a Market Leader in the Profit Optimization Solutions Field

9.     Vendavo's industry-leading margin and profit optimization solutions give businesses the confidence to control prices and discounts without sacrificing sales.

AMENDED COMPLAINT

10.     Combining pricing science, pricing best practices, and best-in-class enterprise software, Vendavo helps deliver 10-30% increases to the bottom line of its Global 2000 companies in the chemicals, industrial manufacturing, high-tech, and distribution industries.

11.     Vendavo's Profit Analyzer and Business Risk Alerts software allows customers to identify margins, price, and profit opportunities, and track key account or product risks.

12.     Vendavo's Price Manager, Segmentation Manager, and Price Optimization Manager software allows customers to manage price lists, and set policies to maximize margins and potential revenue on every deal.

13.     Vendavo's Deal Guide and Deal Manager software allow customers to create, evaluate, and approve deals that support commercial excellence strategies.

14.     Together, Vendavo's software offerings comprise a suite of enterprise profitability solutions, which are sold to customers in the United States and worldwide.

**B.      Through its Research and Development Efforts, Vendavo Has Accumulated Valuable Confidential Proprietary Information and Trade Secrets**

15.     While patenting some of the novel aspects of its price optimization technology, Vendavo also accumulated additional confidential and proprietary intellectual property that it uses in the implementation and manufacture of its comprehensive business to business ("B2B") margin and profit optimization solutions.  Vendavo maintains confidentiality with respect to a range of competitive, proprietary information.  Examples of such information include, *inter alia*:  source code, customer lists and customer-related information, pricing information, vendor lists and related information, marketing plans and strategic business development initiatives, "negative know-how" learned through the course of research and development, and other information related to the development of its price-optimization software, including design concepts and ideas for product enhancements.  Vendavo also created confidential and proprietary intellectual property via its exploration of solutions that ultimately proved too complex or too expensive for the mass market; and its experience with "dead-ends" encountered in developing its products and services continues to inform the ongoing development of Vendavo's solutions today.

16.     The details actually used in Vendavo's source code for its solutions, as well as customer lists, pricing data, vendor lists, marketing plans, strategic business initiatives, design concepts, product improvement plans and ideas, and the lessons learned from research and development, constitute trade secrets that are highly valuable to Vendavo and would be highly valuable to any competitor in the price optimization space.

17.     For example, the identities of the majority of Vendavo's customers are closely guarded even within the company.  Their identities would be valuable to a competitor who could target those customers knowing they are receptive to purchasing price optimization software solutions.  In addition to their identities, Vendavo has also developed valuable, proprietary, and confidential information that would enable a competitor to more effectively target those customers by understanding their needs.  Such information includes the features and specifications of the software that each customer has purchased, the terms of agreements between Vendavo and its customers (including pricing of the software), the identities and preferences of key personnel at each customer, bug reports and support requests from the customer, and the specific customization needs that each Vendavo customer has requested.

18.     The full list of Vendavo's customers is maintained in a database to which very few people at the company have access.  Similarly, only limited individuals targeting prospective customers have access to the complete list of companies Vendavo has identified as potential customers.  Engineers may learn the identity of specific Vendavo customers in the course of their work (e.g., to respond to support requests or to provide custom features).  As further explained below, all employees are contractually bound to keep this information confidential.

19.     In addition to source code, Vendavo maintains valuable, proprietary, and confidential software development information.  Such information includes engineering tickets, project information (similar to a blueprint for future functionality in a customer's software), and testing and validation data.  This information reflects proprietary and confidential details about Vendavo's software, including programming techniques, solutions to technical challenges, performance characteristics, potential vulnerabilities, and future development plans.  A competitor could use this information in many ways, including to copy Vendavo's features and implementation, front-run

features under development, and save valuable time and effort in its own software development process.

20. Vendavo also maintains valuable, proprietary, and confidential information about its sales strategy and pricing methodology. Such information includes competitive research and strategies for market differentiation, product implementation and deployment strategy, and price lists (including products and hourly rates for assigned personnel). Such information would enable a competitor to more effectively target Vendavo's customers and potential customers by positioning itself favorably in a direct comparison to Vendavo.

21. Vendavo's substantial and sustained investment in price optimization technology over several years – and the intellectual property that resulted – have made Vendavo's B2B margin and profit optimization services the most comprehensive solution in the industry today. For these reasons and others, Vendavo's price optimization technology and the intellectual property associated with it are some of Vendavo's most valuable assets.

**C.     Vendavo Protects Its Confidential, Proprietary, and Trade Secret Information**

22. Vendavo takes the protection of its proprietary information seriously. Vendavo takes diligent and reasonable steps to protect its proprietary information from disclosure or use by third parties, unless such third parties are subject to protective provisions restricting disclosure or further use of the proprietary information unless in furtherance of Vendavo's interests. These measures include, by way of example, strict limitations on the dissemination of information on a need-to-know basis, the use of employee confidentiality agreements, the use of non-disclosure agreements with third parties, and the deployment of multiple layers of password-only access to its databases.

23. Internally, Vendavo protects its proprietary information by requiring its employees to execute a confidentiality agreement ("Confidentiality Agreement"). Vendavo's Confidentiality Agreement exists to protect Vendavo's highly sensitive confidential trade secrets from public disclosure, and provides that it extends perpetually beyond the termination of employment.

24. Vendavo's information is a corporate asset and it has policies and practices in place to protect against all forms of unauthorized access, use, disclosure, modification, or destruction of its information. Accordingly, Vendavo requires that all of its employees and contractors take steps to

safeguard proprietary information.  Vendavo mandates that employees or contractors follow specified procedures with respect to: information access, classification of confidential information, and handling of information and devices containing Vendavo information.  For example, Vendavo requires complex passwords with limited duration for user authentication.  Vendavo implements extensive technical safeguards to protect the integrity of its information, including network firewalls and protections associated with remote working access.  In addition, Vendavo implements data security measures, such as encryption, on all Vendavo electronic devices.  When an employee departs, Vendavo conducts an exit interview during which Vendavo reviews the employee's ongoing legal obligations relating to confidential information and data security.  Vendavo requires that all devices containing company information, as well as any physical embodiments of Vendavo information, be returned upon the employee's departure.  Vendavo also employs layers of physical protections at its work sites, including facility access controls and locks on cabinets containing confidential materials.  Moreover, employees and visitors are prohibited from using imaging and recording devices absent specific approval.

**D.     Vendavo Has Copyright Protection for Its Source Code**

25.     The computer programs embodied in Vendavo's Profit Analyzer, Business Risk Alerts, Price Manager, Segmentation Manager, Price Optimization Manager, Deal Guide and Deal Manager software are original literary works within the meaning of 17 U.S.C. § 101, and were developed by it after a significant expenditure of time and money.

26.      The copyright that subsists in Vendavo's Profit Analyzer, Business Risk Alerts, Price Manager, Segmentation Manager, Price Optimization Manager, Deal Guide and Deal Manager software belongs exclusively to Vendavo.

27.     Vendavo filed for and received United States copyright registrations in these works.

**E.     Vendavo Has Received Patent Protection for Its Pioneering Inventions**

28.     Vendavo has also been awarded numerous patents in the field of price optimization technology, including:

a.     U.S. Patent No. 8,396,814, titled "Systems and methods for index-based pricing in a price management system," which provides a flexible pricing method for providing pricing

adjustments for a product in a deal in response to price variations in selected indices, a copy of which is attached hereto as **Exhibit A**.

b.       U.S. Patent No. 7,640,198, titled "System and method for generating and displaying indexed price modeling data," which provides a system suitable for displaying price modeling data having an indexing module that calculates indices based on price modeling data and a display module configured to display a calculated index, a copy of which is attached hereto as **Exhibit B**.

c.       U.S. Patent No. 7,308,421, titled "System and method for grouping products in a catalog," which discloses an apparatus and method for preparing a price quote for a product, a copy of which is attached hereto as **Exhibit C**.

d.       U.S. Patent No. 8,412,598, titled "Systems and methods for a causality analyzer," which teaches a causality analyzer that provides attribution of causality effects for changes in revenue, margin and margin percentage, a copy of which is attached hereto as **Exhibit D**.

e.       U.S. Patent No. 7,912,792, titled "Systems and methods for making margin-sensitive price adjustments in an integrated price management system," which provides systems and methods for generating margin sensitive pricing quotations in an integrated price adjustment system, including: a) selecting products in selected product sets; b) providing pricing data corresponding to the products in selected product sets; c) providing guidance elements for products in selected product sets wherein guidance elements are margin sensitive; d) calculating guidance prices for products based upon guidance elements; e) selecting one of either pricing data or guidance prices; and f) generating a quotation based upon selections made such that margin sensitive pricing adjustments are incorporated into quotations, a copy of which is attached hereto as **Exhibit E**.

**IV.    SINCE ITS INCEPTION, PFX HAS UNLAWFULLY RELIED ON VENDAVO'S PROPRIETARY INFORMATION AND EXPERTISE.**

**A.    PFX Was Founded by Disgruntled Ex-Employees who Built the Company on Stolen Vendavo IP.**

29.    PFX was founded in 2011[1] by a handful of disgruntled Vendavo employees with detailed access to Vendavo's source code and other confidential information.  PFX co-founder and current CEO, Marcin Cichon, was terminated from Vendavo in late 2010 when Cichon wanted greater responsibility, despite failing to perform in his existing role.  In a few short months—and in violation of his termination agreement—he and his co-founders Christian Tratz and Martin Wricke (both also ex-Vendavo) founded PFX.  In under a year, PFX launched its first product, which, along with all subsequent PFX products, bore a ***striking*** resemblance to existing Vendavo software.  *See* Price *f*(x), Release '1.4' Release Notes, Dec. 28, 2011, *available at* https://www.pricefx.eu/site/wp-content/uploads/2016/02/ PriceFx_ReleaseNotes_1.4_2011-12-28_EN.pdf.  Specifically, and as further described below, within one year from inception PFX was able to release the same three core software modules that had taken Vendavo years to develop.

30.    In Cichon's role as Vendavo's European General Manager and Vice President from 2006 to 2010, Cichon had primary responsibility for Vendavo's operations in Europe.  He was privy to Vendavo's confidential marketing and business strategy and customer-related information, including product roadmaps, pricing details and customer identities.  These are literally crown jewels of Vendavo's business.  In the same period, Christian Tratz was engaged by Vendavo to develop the first version of Vendavo's software, to oversee the development of the Vendavo pricing and margin solution, and to develop the architecture for Vendavo's products.  In this role, Tratz had access to Vendavo's proprietary source code and confidential software development details, and the negative know-how associated with the development process.  Martin Wricke was engaged by Vendavo from 2006 until late 2009, focusing on business strategy and marketing relating to Vendavo's product development.  Wricke was privy to Vendavo's confidential marketing and business strategy information.  During this time, Vendavo was awarded the '421 patent on December 11, 2007, and the '198 patent on December 29, 2009.

---

[1] While PFX holds itself out as having been founded in 2011, PFX CEO and co-founder reports on his LinkedIn profile that he has worked at PFX since 2010.

31.     As a result of their duties at Vendavo, Cichon and Tratz had substantial access to all of Vendavo's proprietary, confidential, and trade secret information.  Such information included, *inter alia*, business management information, customer lists, business strategies, design concepts, and proprietary algorithms embodied in Vendavo's source code.

32.     Each co-founder was party to a confidentiality agreement and agreed not to take Vendavo's confidential information, including its source code.  Cichon, Tratz, and Wricke each signed confidentiality agreements with respect to such information, in which they agreed "at all times during the term of [their] relationship with the Company ***and thereafter***, to hold in strictest confidence, and not to use, except for the benefit of the Company…and Confidential Information of the Company" which they obtained or created.  Those confidentiality provisions survived the termination of Cichon's employment and Tratz's consulting work.  Moreover, Cichon, Tratz, and Wricke assigned to Vendavo all intellectual property rights in the software, solutions, and architecture developed in the course of their respective work for Vendavo.

33.     The Vendavo connection is not limited to self-proclaimed PFX co-founders Cichon, Tratz, and Wricke.  PFX also engaged Vendavo contractor Jiri Fabian through his company, TopMonks.  Fabian worked for Vendavo from 2003 to 2014.  In 2011, he founded TopMonks, whose website boasts that: "TopMonks is proud partner and ***co-author*** of [the PFX] so[f]tware solution which is now bringing significant value to dozens of multinational customers …. Pricef(x) is now vigorously expanding west."  TopMonks, References, https://www.topmonks.com/references/#price-fx (last visited April 4, 2018) (emphasis added).  TopMonks later also recruited former Vendavo account executive Gabe Smith, who now simultaneously holds positions at both TopMonks and PFX in San Jose, California.

**B.     PFX Unfairly Competes with Vendavo in the United States by Benefitting from Vendavo's Misappropriated Trade Secrets, Systematically Poaching Vendavo's Expertise, and Targeting Vendavo's Customers.**

34.     Consistent with its untoward beginnings, PFX has pursued a growth strategy centered on mimicking Vendavo's products, stealing Vendavo's talent and trade secrets, and luring Vendavo's customers and prospects, including on information and belief telling prospects that they are "the same as Vendavo only less expensive and easier to deal with".

       **i.   PFX's Products Mimic Vendavo's Products in Name, Function, and Marketing.**

35.     Just like Vendavo, PFX offers for sale and sells a full suite price management and CPQ software solution for price management.  PFX's website, accessible to customers in the United States and California, touts PFX's software offerings:

- The PFX PriceBuilder allows customers to define price policies by setting up "price guidelines, calculations and simulations of gross, special and net prices including algorithmic optimization as well as the rule based and/or manual approval of price calculation results."
- The PFX PriceAnalyzer allows customers to "identify margin and/or price opportunities," and supports "all types of price related optimizations."
- The PFX QuoteConfigurator and QuoteConfigurator for iPad supports "sales and back office teams with the quote configuration [], calculation and simulation capability."

36.     Each of PFX's PriceAnalyzer, PriceBuilder, and QuoteConfigurator products incorporates the same functionalities and addresses the same needs as Vendavo's Profit Analyzer, Price Manager, and Deal Manager software, respectively.

37.     PFX's PriceAnalyzer, PriceBuilder, and QuoteConfigurator products were launched, and therefore accelerated to market, in a far shorter time period than Vendavo's corresponding products.  Specifically, Vendavo spent three years developing the initial release of its Profit Analyzer, Price Manager, and Deal Manager software.  But, as noted above, within one year of its founding by ex-Vendavo employees, PFX developed and released the three same core modules—analytics, price management, and quote/deal management—calling them PriceAnalyzer, PriceBuilder, and PriceShop (later renamed QuoteConfigurator), respectively.

38.     Similarly, within two years of Vendavo releasing a rebate feature for Deal Manager in 2011, PFX had released its own RebateManager software.

39.     Then, following Vendavo's release of its Price Optimization Manager in 2014 and Segmentation Manager in 2015, and after a significant exodus of Vendavo technical personnel to PFX as described below, PFX introduced a module known as PriceOptimizer in 2017.  The PriceOptimizer module is described as a module that "will help segment your business and calculate optimized prices or price guidance" and bears striking resemblance in name and purpose to Vendavo's Price Optimization Manager and Segmentation Manager.

40.     In addition, after Vendavo launched a software-as-a-service ("SaaS") version of its software, PFX announced in January 2017 it would launch a SaaS turn-key solution called "Pricing-as-a-Service."  PFX advertised this product as a "game-changing and completely unique concept."

### ii.  PFX Has Systematically Raided Vendavo's Employees

41.     The joint European and U.S. operation of PFX have systematically raided Vendavo employees and targeted Vendavo as its chief competitor in the marketplace.  In addition to Cichon, Tratz, and Wricke, at least 22 other Vendavo employees have left Vendavo and gone to work at PFX since 2013.  In total, ***PFX has hired away almost 40 Vendavo employees*** over the years.  Of the ninety-nine employees currently associated with PFX on the company's LinkedIn site, thirty-two employees have worked at Vendavo.[2]  Former Vendavo employees make up almost one-third of PFX's current employees—far more than would occur by coincidence or the mere fact that the two companies are in the same industry.  As detailed below, PFX has knowingly benefitted from its new employees' use, knowledge, and disclosure of Vendavo's proprietary information and trade secrets.

42.     Moreover, armed with Vendavo's highly confidential information obtained from ex-Vendavo employees, PFX has strategically targeted several of Vendavo's customers and prospects.

### C.     PFX Targeted Vendavo Engineering Personnel to Gain Access to Vendavo's Latest Source Code and Technological Know-How.

43.     PFX has systematically targeted Vendavo's engineers and knowingly benefitted from such employees' access to and—in some instances—misappropriation of Vendavo's source code and other trade secrets.

44.     Rather than invest the time, capital, and training necessary to cultivate its own engineering team and develop its own innovative products, PFX sought to poach that expertise from Vendavo.  To illustrate the scope of the employee poaching, the following is a non-exhaustive list of Vendavo engineers and other employees with technical know-how who were recruited by PFX from Vendavo:  (i) Jiri Vyoralek, Vendavo Solution Engineer from January 2015 to January 2018; (ii) Michal Imrisek, Vendavo Solution Engineer from February 2015 to January 2017; (iii) Jiri Machat, Vendavo Lead Solution Engineer from January 2012 to January 2017; (iv) Michal Rychtar, Vendavo

---

[2] This number does not even include Fabian (whose LinkedIn now associates him only with TopMonks) and Tratz (who now does not list a LinkedIn profile).

Solution Engineer from September 2013 to January 2017; (v) Jaroslav Dub, Vendavo Lead Solution Engineer from August 2014 to December 2016; (vi) Pavel Zbranek, Vendavo Engineering Manager from August 2010 to May 2016; (vii) Tomas Lamr, Vendavo Software Engineer from January 2013 to April 2016; (viii) Ondrej Polansky, Vendavo Support Engineer from October 2012 to April 2016; (ix) Michal Pesat, Vendavo Solution Architect from March 2012 to March 2016; (x) Veronika Gavenciakova, Vendavo Lead Solution Engineer from July 2010 to February 2016; (xi) Barbara Dobrasz, Vendavo Lead Solution Engineer from June 2012 to January 2016; (xii) Pavel Matyasko, Vendavo Senior Technical Trainer from January 2011 to January 2016; (xiii) David Sedlik, Vendavo Lead Solution Engineer from April 2012 to January 2016; (xiv) Radim Vrkoslav, Vendavo Quality Assurance Engineer from July 2013 to January 2016; (xv) Milan Boruvka, Vendavo Senior Director, Engineering from April 2007 to October 2015; (xvi) Marek Duciuc, Vendavo Solution Engineer from January 2012 to May 2015; (xvii) Ondrej Pisa, Vendavo Quality Assurance Engineer from June 2011 to January 2015.

45.     Since the filing of this lawsuit, PFX has continued to hire away Vendavo technical personnel, including Ravi Kiran Bhagavathula, Vendavo Solution Architect from May 2014 to March 2018.  Bhagavathula is based in Chicago and, before his departure, refused to disclose to Vendavo that he was leaving to work for a competitor.

46.     As part of their professional duties at Vendavo, these engineers had access to some of Vendavo's most valuable trade secrets, including source code, customer identities (for accounts each supported), project information, engineering tickets, and testing data (including negative know-how) and strategies regarding development of new products.  But it is not their lawful access and then transition to a competitor that is illicit.  Rather, there is a pattern of duplicity and cover-up among PFX recruits that gives Vendavo a reasonable basis to believe that several of the engineers left Vendavo with its trade secrets for the benefit of PFX.

47.     For example, this pattern of duplicity is particularly evident in the pre-departure activities of solutions engineers Michal Imrisek and Michal Rychtar.  Former Vendavo employees Michal Imrisek and Michal Rychtar left Vendavo in February of 2017 to join PFX.  Prior to their departure, Imrisek and Rychtar each communicated with PFX, while both maintained employment at

1  Vendavo and had access to Vendavo's confidential information.  Moreover, both began working for

2  PFX – including attending training and sales meetings – *while still employed* by Vendavo and while

3  PFX *knew they were still employed by Vendavo*.  In addition, based on Vendavo's review of its

4  information technology, Imrisek accessed Vendavo files on his company laptop and saved data to

5  portable USB devices. This activity is notable because of the timing and the fact that Vendavo's

6  records show that Imrisek did not regularly use USB drives in the course of his employment—he

7  began only in the weeks leading up to his PFX move.  It is Vendavo's information and belief that

8  discovery will reveal Vendavo's trade secrets were saved on Imrisek's USB drives prior to his

9  joining PFX, that Imrisek took that data to PFX and that PFX benefitted from that confidential

10  information.

11       48.  By late 2016, Michal Imrisek apparently intended to leave Vendavo for PFX.  On

12  November 25, 2016, Imrisek searched for PFX on Facebook.  On December 1, 2016, he viewed a

13  PFX onboarding document.  Around the same time, on November 25, 2016, Imrisek used a USB

14  drive to transfer files from his computer.  In January 2017, Imrisek continued to communicate with

15  PFX and performed work for PFX despite representing to Vendavo that he would be available to

16  Vendavo all of January.  In particular, on January 16, 2017, Imrisek purported to be taking paid time

17  off for vacation, but he was in fact attending a training at PFX in Prague.  On January 18, 2017,

18  Imrisek viewed a PFX training document.  On January 19 and 28, 2017, Imrisek used a USB drive to

19  again transfer files from his computer.  On January 31, 2017, his last day at Vendavo, Imrisek wiped

20  his company-issued cell phone before returning it to Vendavo.

21       49.  For Michal Rychtar, the timing is similar. On November 28, 2016, Michal Rychtar

22  received an offer letter from PFX.  He accepted the same day, copying PFX co-founder (and former

23  Vendavo employee) Marcin Cichon on the email and saying he was excited to start.  In early January

24  2018, Rychtar chatted with multiple ex-Vendavo PFX employees about joining PFX and starting

25  work for PFX while still at Vendavo.  Rychtar was invited to attend a PFX training to be held on

26  January 9, 10 and 11.  To attend the training, Rychtar requested paid time off for the days of January

27  9 and 10 and coordinated with another Vendavo employee then slated to leave for PFX, Jiri Machat,

28  who promised to "cover" for him ("If anyone asks I'm finishing…" some work and fixing a bug).

1   Rychtar also apparently declined a Vendavo meeting on January 12 to attend another PFX meeting.

2   Mr. Machat, who continued to help conceal Rychtar's unavailability due to PFX work told Rychtar

3   via Skype on January 11: "Decline tomorrow's meeting because you're at the doctor or something

4   like that so I don't have to think of a reason on the spot."  Rychtar replied "smile.  I'll reach out

5   tomorrow."   While attending the January 12 PFX all hands meeting, Mr. Machat messaged Rychtar

6   on Skype about the ruse: "Be careful of photos."  Rychtar replied: "Yeah, right. I think [someone]

7   was photographing me.  I hope he's not posting anywhere."

8          50.     In the days following the trainings and all hands meeting, while still plainly working

9   at Vendavo, Rychtar kept in communication with PFX management, began filling out his

10  employment paperwork, and began receiving assignments.  On January 26, 2017, while still

11  employed by Vendavo, he accessed his startup paperwork for PFX.  On the same day, he apparently

12  began receiving work assignments from PFX.  He complained to an ex-Vendavo PFX employee

13  about an upcoming travel assignment PFX had already scheduled Rychtar for in early February

14  ("you ass, I thought that the traveling here wouldn't be so bad here.").

15         51.     Then, on January 31, 2017, his last day at Vendavo, Rychtar searched for and

16  downloaded disk wiping software from the internet, and used it to wipe his company-issued

17  computer before returning it to Vendavo.

18         52.     Indeed, Vendavo's forensic analyses have uncovered systematic efforts by departing

19  employees to cover their digital tracks before joining PFX.  Similar to the steps taken by Rychtar and

20  Imrisek to obfuscate their pre-departure digital activities—other employees wiped their computer

21  hard drives, performed factory resets on their phones, and performed full disk encryptions on certain

22  devices.

23         53.     Vendavo has also learned that Pavel Zbranek, who left Vendavo in May 2016, took

24  screenshots of Vendavo's all hands meeting with customer information and financial information on

25  May 27, 2016—days before his departure.  Vendavo takes great efforts to protect such information,

26  including not sending out slide decks and notifying all employees on the call that the information is

27  highly confidential.  Like Imrisek's unusual use of USB drives, Zbranek's activity suggests efforts to

28  collect information for potential transfer to or use at PFX.

54.     In sum, the employees' duplicity (e.g., working for PFX while still employed by Vendavo), their access to highly confidential information, the evidence of transferring files to USB drives outside of the ordinary course, the patterns of digital obfuscation pre-departure, PFX's systematic raiding of Vendavo's engineering workforce, together with PFX's suspiciously similar (and suspiciously quick-to-market) products all reinforce Vendavo's belief that PFX has and continues to use Vendavo's trade secrets.  Specifically, Vendavo is informed and believes that PFX has used Vendavo's misappropriated trade secrets including at least Vendavo's source code; its 2017 product development roadmap documents for Price Manager, Optimization Manager, Segmentation Manager, Business Risk Alerts, Profit Analyzer, Deal Manager, Deal Guide, and shared technologies; its project documentation for product development implemented in 2016, including major enhancements to Deal Manager; details regarding 2016 and 2017 customer relationships, including documents that summarize customer project information; 2016 and 2017 engineering tickets; and new product testing data (including negative know-how) and strategies regarding development of new products and services in 2017.  It is Vendavo's information and belief that discovery will reveal Vendavo's trade secrets were misappropriated by departing Vendavo engineers, including Rychtar, Imrisek, and others, prior to joining PFX, that certain employees took that data to PFX and that PFX has used and continues to use Vendavo's proprietary information.

**D.     PFX Targeted Vendavo Sales Personnel to Gain Access to Vendavo's Proprietary Customer Data.**

55.     In addition to poaching Vendavo's engineering expertise, PFX has benefitted from hiring certain key Vendavo employees with access to Vendavo's highly confidential sales and marketing materials.

56.     For example, in January 2017, PFX hired Vicki Roberts, a veteran Vendavo Sales Director with over a decade at the company.  PFX touted 2017 as "the most successful year in our history," during which it added more new customers than in all past years combined and more than doubled its employees with addition of "industry veterans" like Vicki Roberts, a former Vendavo employee, whom PFX describes as "one of the most accomplished sales professionals in the industry."  Within days of joining PFX, Ms. Roberts began soliciting business from Vendavo

1   customers.  Two years prior, PFX hired Gabe Smith, an account executive.  These employees had

2   deep knowledge of Vendavo's customer base, including past, current, and prospective customers.

3   They also had access to and familiarity with confidential targeted marketing and sales efforts, as well

4   as sales and pricing information.

5   57.   Again, it is not the lawful access by Vendavo employees to Vendavo's trade secrets

6   that necessitates judicial intervention here.  Rather, it is the systematic raiding of Vendavo's talent,

7   the similarities between Vendavo's products and PFX's products, the targeting of Vendavo's

8   customers, ***coupled with*** evidence of employee mishandling of confidential information that leads

9   Vendavo to reasonably believe it has been a victim of misappropriation.

10   58.   For example, within days of joining PFX from Vendavo, Vicki Roberts was in

11   contact with existing Vendavo customers, competing to take their business from Vendavo by

12   leveraging her knowledge from Vendavo about the customer relationship, Vendavo's pricing for the

13   customer, and customer-specific requirements.  Roberts also began soliciting U.S.-based Vendavo

14   employees to join her at PFX.

15   59.   Similarly, former Vendavo account executive Gabe Smith left Vendavo in February

16   2015 to join PFX.  Just before leaving Vendavo, Smith also joined TopMonks in January 2015.  As

17   Vendavo's forensic analysis uncovered, Smith was a serial violator of Vendavo's confidentiality

18   policies.  While employed by Vendavo, Smith frequently sent confidential information to his

19   personal Gmail account.  Such information included Vendavo's customer data, such as the 2014 and

20   2015 customer lists, extensive customer contact information, customer-specific pricing information,

21   executed customer contracts, and 2014 and 2015 marketing materials, among other highly

22   confidential Vendavo information that would give PFX valuable behind-the-scenes access to

23   competitive information and trade secrets.

24   60.   Gabe Smith is currently based in San Jose as PFX's VP of Product Strategy and

25   Alliances; he is also the Executive Vice President of TopMonks and holds himself out as "Founder

26   of TopMonks, LLC".  Upon leaving Vendavo, Smith never disclosed his improper acquisition and

27   retention of Vendavo's confidential information.  Instead, Vendavo has a basis to believe that Smith

28   continues to have access to Vendavo's trade secrets even after he left the company and after he

1    started working for PFX and TopMonks, that he disclosed some or all of the trade secrets to PFX,

2    and that PFX benefitted from Smith's ill-gotten information.  Specifically, Vendavo is informed and

3    believes Smith misappropriated at least Vendavo's 2015 customer lists and contacts, its 2015 list of

4    prospective customers, its 2015 pricing details for the Vendavo software suite, and 2015 Vendavo

5    marketing materials.

6                              **FIRST CLAIM FOR RELIEF**
                   **Misappropriation of Trade Secrets Under 18 U.S.C. § 1836,** *et seq.*
7                              **(Against All Defendants)**

8        61.    Vendavo incorporates by reference each of paragraphs 1 – 60 as though fully set forth

9    herein.

10       62.    Vendavo owns and possesses certain confidential, proprietary, and trade secret

11   information, as alleged above.  One example of the trade secret information is reflected in the source

12   code for Vendavo's software.

13       63.    Vendavo's asserted trade secrets include information not expressly covered by its

14   patents.  Such information includes its source code, customer lists and customer-related information,

15   pricing information, vendor lists and related information, marketing plans and strategic business

16   development initiatives, "negative know-how" learned through the course of research and

17   development, and other information related to the development of its price-optimization software,

18   including ideas and plans for product enhancements.

19       64.    Vendavo's confidential, proprietary, and trade secret information relates to products

20   and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or

21   ordered in, interstate or foreign commerce.

22       65.    Vendavo has taken reasonable measures to keep such information secret and

23   confidential by, for example, establishing and enforcing information security policies and practices

24   for all its employees and contractors, limiting access to confidential information through use of

25   password protection and physical security measures such as badge access and locked cabinets,

26   requiring employees to sign a confidentiality agreement with ongoing confidentiality obligations that

27   survive the employee's tenure at Vendavo, implementing data security measures and encryption on

28

all Vendavo electronic devices, and requiring the return of all Vendavo information upon an employee's exit from the company.

66.    As a result of these security measures, Vendavo's confidential and proprietary trade secret information is not available for others in the price optimization software industry – or any other industry – to use through any legitimate means.

67.    Vendavo's confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

68.    In violation of Vendavo's rights, Defendants misappropriated Vendavo's confidential, proprietary and trade secret information in the improper and unlawful manner as alleged herein. Defendants' misappropriation of Vendavo's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Defendants have attempted and continue to attempt to conceal their misappropriation.

69.    Defendants' misappropriation has continued to occur after May 11, 2016 both through new acts of improper acquisition and through continued use of Vendavo's trade secrets first acquired earlier.

70.    Defendants have taken actions in the United States in furtherance of their misappropriation.  Defendants promote their software (which incorporates Vendavo's trade secrets) in the United States and provide their software to customers in the United States.  Defendants have also attended and hosted conferences in the United States for the purpose of promoting their software and supporting customers in the use of their software, including conferences attended by co-founders Marcin Cichon and Martin Wricke.

71.    Specifically, Defendants held a "User Conference" in Las Vegas in November of 2016 at which at least Cichon, Wricke and Gabe Smith attended; exhibited at a "Pricing Conference" in Chicago in 2016, at which at least Cichon, Wricke and Gabe Smith attended; held a "Chicago Office Opening" event in 2016—attended by Cichon; exhibited at a "Pricing Conference" in Miami in 2017, at which Cichon and current and former Vendavo customers attended; exhibited at a

"Pricing Conference" in San Diego in 2017, at which Gabe Smith attended.  Price f(x) AG has indisputably participated in U.S.-based sales activities.

72.    If Defendants are not enjoined, Defendants will continue to misappropriate and use Vendavo's trade secret information for their own benefit and to Vendavo's detriment, including by selling software that directly competes with Vendavo's core software products and service.

73.    As the direct and proximate result of Defendants' conduct, Vendavo has suffered – and if Defendants' conduct is not stopped, will continue to suffer – severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Vendavo's remedy at law is inadequate, Vendavo seeks, in addition to damages, injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests. Vendavo's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

74.    Vendavo has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorney's fees.

**SECOND CLAIM FOR RELIEF**
**Infringement of U.S. Patent No. 8,396,814**
**(Against All Defendants)**

75.    Vendavo incorporates by reference each of paragraphs 1 –60 as though fully set forth herein.

76.    The '814 patent attached to this complaint as Exhibit A is entitled "Systems and Methods for Pricing in a Price Management System," and was duly and lawfully issued on March 12, 2013.  A true and correct copy of the '814 patent is attached to this Complaint as Exhibit A.

77.    Vendavo is the owner of all rights, title, and interest in the '814 patent, including the right to bring this suit for injunctive relief and damages.

78.    The '814 patent is valid and enforceable.

79.    The '814 patent claims a method for providing pricing adjustments in response to price variations in selected indices.  Specifically, the claimed method is an improvement over prior methods of using index-based formulas, which were complicated and cumbersome and not conducive to efficient deal negotiation.  The '814 patent's novel system monitors an index for

20

changes and automatically re-prices all deals in a price management system which include a product tied to that index, using a formula that weights the index against other components and adds an offset adjustment.  Thus, a sales force is able to effectively incorporate index-based pricing terms into deals.

80.     The individual claim elements—including re-pricing when the change in index exceeds a threshold and computing a new price by weighting the index and setting an index offset— and the claimed combination were not well-understood, routine, or conventional activity before the invention of the '814 patent.

81.     During prosecution of the '814 patent, there was no finding by the Patent Office that the claims were directed to an abstract idea or that the claim elements lacked an inventive concept that transformed the abstract idea into a patent-eligible application, or that the recitation of a computer had any bearing on either of those factors.

82.     Defendants have infringed, and continue to infringe, literally and/or through the doctrine of equivalents, one or more claims of the '814 patent, including but not limited to claim 1, pursuant to 35 U.S.C. § 271(a), by making, using, selling, offering to sell, and/or importing within the United States, without authority, certain software products, including the PFX PriceBuilder.

83.     Upon information and belief, the PFX PriceBuilder is a flexible pricing method implemented on a computerized integrated price management system, which provides for pricing adjustments for a product in a deal in response to price variations in selected indexes, wherein the deals include initial pricing.

84.     Upon information and belief, the PFX PriceBuilder selects a threshold value.

85.     Upon information and belief, the PFX PriceBuilder designates an index for a product in a deal, wherein the said index has a published index value based upon an index position.

86.     Upon information and belief, the PFX PriceBuilder monitors the index for changes in the published index value.

87.     Upon information and belief, the PFX PriceBuilder retrieves all deals including that product for which there has been a change in the published index value.

88.     Upon information and belief, the PFX PriceBuilder compares the changed published index value to the initial pricing, and if the difference between the changed published index value and the initial pricing is greater than the selected threshold value, then the PFX PriceBuilder computes a price for that product in that deal based on the changed published index value, wherein the computing the price includes weighting the index and setting an index offset.

89.     Upon information and belief, the PFX PriceBuilder then reprices all deals using the computed price, wherein the re-pricing all deals includes re-pricing that product or, if the difference between the changed published index value and the initial pricing is equal to or less than the selected threshold value, then the PFX PriceBuilder maintains the initial pricing of the deal.

90.     Defendants' infringement of the '814 patent has been willful and deliberate because Defendants knew or should have known about the '814 patent and their infringement of that patent but acted despite an objectively high likelihood that such acts would infringe the patent.  The individuals who developed the PFX PriceBuilder product include former Vendavo employees who – while Vendavo employees, and on behalf of Vendavo, which owns the '814 patent – would have had knowledge of the patent since it was issued in March 2013.

91.     As the direct and proximate result of Defendants' conduct, Vendavo has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Vendavo's remedy at law is inadequate, Vendavo seeks, in addition to damages, injunctive relief.  Vendavo's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

**THIRD CLAIM FOR RELIEF**
**Infringement of U.S. Patent No. 7,640,198**
**(Against All Defendants)**

92.     Vendavo incorporates by reference each of paragraphs 1 – 60 as though fully set forth herein.

93.     The '198 patent attached to this complaint as Exhibit B is entitled "System and Method for Generating and Displaying Indexed Price Modeling Data," and was duly and lawfully

1   issued on December 29, 2009.  A true and correct copy of the '198 patent is attached to this

2   Complaint as Exhibit B.

3       94.    Vendavo is the owner of all rights, title, and interest in the '198 patent, including the

4   right to bring this suit for injunctive relief and damages.

5       95.    The '198 patent is valid and enforceable.

6       96.    The '198 patent claims a system for displaying a transaction table including a

7   computed index.  The claimed system is an improvement over prior systems in which indexing and

8   aggregating data caused loss of individual transaction information and which were not responsive to

9   real-time data changes.  The '198 patent's novel system configures a data source using a calculation

10  parameter and a mapping parameter, calculates an index for the data, allows the index to be

11  displayed, and provides a zoom function.

12      97.    The individual claim elements—including configuration of a data source using a

13  calculation parameter and a mapping parameter and dynamically updating an index in response to

14  changes in price modeling data—and the claimed combination were not well-understood, routine, or

15  conventional activity before the invention of the '198 patent.  For example, indexes were typically

16  calculated in batch processes and not useful to compare real-time data changes.

17      98.    During prosecution of the '198 patent, there was no finding by the Patent Office that

18  the claims were directed to an abstract idea or that the claim elements lacked an inventive concept

19  that transformed the abstract idea into a patent-eligible application, or that the recitation of a

20  computer had any bearing on either of those factors.

21      99.    Defendants have infringed, and continue to infringe, literally and/or through the

22  doctrine of equivalents, one or more claims of the '198 patent, including but not limited to claim 1,

23  pursuant to 35 U.S.C. § 271(a), by making, using, selling, offering to sell, and/or importing within

24  the United States, without authority, certain software products, including the PFX PriceBuilder.

25      100.   Upon information and belief, the PFX PriceBuilder is a system for displaying a

26  transaction table including an index, useful in association with price modeling and useful in

27  association with a data source.

28

AMENDED COMPLAINT

101.     Upon information and belief, the PFX PriceBuilder comprises a database configured to store transaction data, including price modeling data, from the data source and dynamically store changes to the transaction data, including price modeling data, from the data source, and further configured to provide client configuration of the data source, wherein the client configuration includes at least one calculation parameter and at least one mapping parameter and wherein the price modeling data depends upon the client configuration.

102.     Upon information and belief, the PFX PriceBuilder comprises a server coupled to the database over a network, which is configured to request the transaction data including price modeling data from the database via the network, wherein the transaction data is requested in accordance with one mapping parameter; populate the transaction table with the price modeling data; calculate at least one index base using the price modeling data populated in the transaction table, wherein the index base is the denominator of the index, and wherein the index base is calculated according to a calculation parameter; identify the index numerator from the price modeling data populated in the transaction table, generate the index by dividing the index numerator by the index base, wherein the index is a summary measure stating relative comparisons between groups of related items; dynamically update the index in response to changes in the price modeling data; and configure the transaction table to include the index column and load the index into the index column.

103.     Upon information and belief, the PFX PriceBuilder comprises a display coupled to the server and configured to display the index in the transaction table, and wherein the display is also configured to display a limited subset of the transaction table, where the subset is selected by a zoom function.

104.     Defendants' infringement of the '198 patent has been willful and deliberate because Defendants knew or should have known about the '198 patent and their infringement of that patent but acted despite an objectively high likelihood that such acts would infringe the patent.  The individuals who developed the PFX PriceBuilder product include former Vendavo employees who – while Vendavo employees, and on behalf of Vendavo, which owns the '198 patent – would have had knowledge of the patent since it was issued in December 2009.

105.    As the direct and proximate result of Defendants' conduct, Vendavo has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Vendavo's remedy at law is inadequate, Vendavo seeks, in addition to damages, injunctive relief.  Vendavo's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

**FOURTH CLAIM FOR RELIEF**
**Infringement of U.S. Patent No. 7,308,421**
**(Against All Defendants)**

106.    Vendavo incorporates by reference each of paragraphs 1 – 60 as though fully set forth herein.

107.    The '421 patent attached to this complaint as Exhibit C is entitled "Systems and Methods for Grouping Products in a Catalog," and was duly and lawfully issued on December 11, 2007.  A true and correct copy of the '421 patent is attached to this Complaint as Exhibit C.

108.    Vendavo is the owner of all rights, title, and interest in the '421 patent, including the right to bring this suit for injunctive relief and damages.

109.    The '421 patent is valid and enforceable.

110.    The '421 patent claims an improved price quotation system.  Specifically, the claimed system is an improvement over prior electronic pricing systems which required that product price rules be manually adjusted each time the vendor wanted to alter a price rule or alter the identity of the products to which the price rule applies.  The '421 patent's novel system uses dynamic selection rules to define a collection of products to which a price rule is applied.  As market conditions change, the product collections, and thus the price rule(s) applicable to a particular product, automatically change according to the dynamic selection rules.  The claimed price quotation system is therefore more responsive to changing market conditions without the need for manually adjusting price rules.

111.    The claimed price quotation system also uses a pricing scheme to apply price rules to a product.  Depending on market conditions and the dynamic selection rules, multiple price rules may apply to a particular product.  The pricing scheme includes special rules that determine how the

multiple rules are applied.  Such rules include inheritance rules, assertion rules, connectivity rules, and arbitration rules.

112.    The individual claim elements—including dynamic selection rules and pricing scheme—and the claimed combination were not well-understood, routine, or conventional activity before the invention of the '421 patent.  In particular, prior electronic pricing systems used only static product groupings and had no mechanism to automatically introduce price rules on a dynamic basis.

113.    During prosecution of the '421 patent, claim 1 was amended to recite that the claimed method was performed "[i]n a computer system," and the applicant stated, "hence [the claims] are now in compliance with both 35 USC 101 and 35 USC 112."  The amendment and remarks were made after the Patent Office found the submitted claims subject to a restriction and/or election requirement.  There was no finding by the Patent Office that the claims covered ineligible subject matter without the recitation of a computer, nor any concession by the applicant to that effect.

114.    Defendants have infringed, and continue to infringe, literally and/or through the doctrine of equivalents, one or more claims of the '421 patent, including but not limited to claim 1, pursuant to 35 U.S.C. § 271(a), by making, using, selling, offering to sell, and/or importing within the United States, without authority, certain software products, including the PFX PriceAnalyzer.

115.    On information and belief, the PFX PriceAnalyzer prepares a price quote for a product by determining whether said product is a member of a particular product collection, including evaluating a dynamic selection rule set associated with that particular product collection.

116.    When a product is determined to be a member of a particular product collection then, Upon information and belief, the PFX PriceAnalyzer identifies one or more price rules associated with the particular product collection; and applies price rules to that product in order to determine the price quote for that product, wherein the price rules are determined in accordance with a pricing scheme that is associated with the product collection.

117.    When a product is determined to be a member of a particular product collection then, Upon information and belief, the PFX PriceAnalyzer further identifies the pricing scheme that includes (i) at least one inheritance rule to be applied when at least two price rules of the pricing

1  scheme having a similar rule type at different rule levels of a rule hierarchy, and wherein the

2  inheritance rule filters out at least one price rule of each of the different rule levels for the given

3  product, (ii) at least one assertion rule which defines which of the at least two price rules to ignore

4  when a specific price or price rule type has been applied, (iii) at least one arbitration rule for defining

5  a value to use when several price rule are applicable to the given product, and (iv) at least one

6  connectivity rule, and wherein the at least one connectivity rule defines interaction between other

7  price rules of said pricing scheme, including combining and prioritizing the other price rules.

8         118.    Defendants' infringement of the '421 patent has been willful and deliberate because

9  Defendants knew or should have known about the '421 patent and their infringement of that patent

10  but acted despite an objectively high likelihood that such acts would infringe the patent.  The

11  individuals who developed the PFX PriceAnalyzer product include former Vendavo employees who

12  – while Vendavo employees, and on behalf of Vendavo, which owns the '421 patent – would have

13  had knowledge of the patent since it was issued in December 2007.

14         119.    As the direct and proximate result of Defendants' conduct, Vendavo has suffered and,

15  if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable

16  injury, and significant damages, in an amount to be proven at trial.  Because Vendavo's remedy at

17  law is inadequate, Vendavo seeks, in addition to damages, injunctive relief.  Vendavo's business

18  operates in a competitive market and will continue suffering irreparable harm absent injunctive

19  relief.

20                          **FIFTH CLAIM FOR RELIEF**
                  **Infringement of U.S. Patent No. 8,412,598**
21                          **(Against All Defendants)**

22         120.    Vendavo incorporates by reference each of paragraphs 1 – 60 as though fully set forth

23  herein.

24         121.    The '598 patent attached to this complaint as Exhibit D is entitled "System and

25  Method for Causality Analyzer," and was duly and lawfully issued on April 2, 2013.    A true and

26  correct copy of the '598 patent is attached to this Complaint as Exhibit D.

27         122.    Vendavo is the owner of all rights, title, and interest in the '598 patent, including the

28  right to bring this suit for injunctive relief and damages.

123.    The '598 patent is valid and enforceable.

124.    The '598 patent claims a causality analyzer that disaggregates changes in total margin, percent margin, and total revenue by causality effects such as price effect, cost effect, and product mix effect.  Specifically, the claimed system is an improvement over prior systems, which were too inaccurate, unreliable, and intractable to use in price management and analysis.  The '598 patent's novel system includes a causality modeler and a causality attributor able to disaggregate changes by causality effect and unbias the causality effects that interact.

125.    The individual claim elements—including the causality attributor for disaggregating causality effects and the unbiasing causality effects using a finite difference approach— and the claimed combination were not well-understood, routine, or conventional activity before the invention of the '598 patent.  For example, prior systems relied either on human intuition to make rough estimates of causal effects or on computer systems making gross estimations in their computations or only intermittently analyzing causality.

126.    During prosecution of the '598 patent, there was no finding by the Patent Office that the claims were directed to an abstract idea or that the claim elements lacked an inventive concept that transformed the abstract idea into a patent-eligible application, or that the recitation of a computer had any bearing on either of those factors.

127.    Defendants have infringed, and continue to infringe, literally and/or through the doctrine of equivalents, one or more claims of the '598 patent, including but not limited to claim 1, pursuant to 35 U.S.C. § 271(a), by making, using, selling, offering to sell, and/or importing within the United States, without authority, certain software products, including the PFX PriceAnalyzer.

128.    Upon information and belief, the PFX PriceAnalyzer comprises a time period selector that is implemented on a computer system and configurable to select a reference time period and a comparison time period.

129.    Upon information and belief, the PFX PriceAnalyzer comprises a causality modeler implemented on a computer system that is configurable to receive transaction data and calculate change in total margin, percent margin and total revenue between the reference time period and the comparison time period using the transaction data.

130.    Upon information and belief, the PFX PriceAnalyzer comprises a causality attributor implemented on a computer system that is configurable to disaggregate each of the change in total margin, the percent margin and the total revenue by causality effects, wherein the causality effects include price effect, cost effect, quantity effect, product mix effect, customer mix effect, exchange rate effect, new and lost business, and an adjustment change, and is further configurable to unbiased the causality effects where they interact using a finite difference approach, wherein the finite difference approach splits the shared effect according to proportionate percentage of the change attributed only to each effect.

131.    Defendants' infringement of the '598 patent has been willful and deliberate because Defendants knew or should have known about the '598 patent and their infringement of that patent but acted despite an objectively high likelihood that such acts would infringe the patent.  The individuals who developed the PFX PriceAnalyzer product include former Vendavo employees who – while Vendavo employees, and on behalf of Vendavo, which owns the '598 patent – would have had knowledge of the patent since it was issued in April 2013.

132.    As the direct and proximate result of Defendants' conduct, Vendavo has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Vendavo's remedy at law is inadequate, Vendavo seeks, in addition to damages, injunctive relief.  Vendavo's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

**SIXTH CLAIM FOR RELIEF**
**Infringement of U.S. Patent No. 7,912,792**
**(Against All Defendants)**

133.    Vendavo incorporates by reference each of paragraphs 1 – 60 as though fully set forth herein.

134.    The '792 patent attached to this complaint as Exhibit E is entitled "Systems and Methods for Making Margin-Sensitive Price Adjustments in an Integrated Price Management System," and was duly and lawfully issued on July 12, 2002.  A true and correct copy of the '792 patent is attached to this Complaint as Exhibit E.

135.    Vendavo is the owner of all rights, title, and interest in the '792 patent, including the right to bring this suit for injunctive relief and damages.

136.    The '792 patent is valid and enforceable.

137.    The '792 patent claims a system for generating margin sensitive pricing quotations. Specifically, the claimed system is an improvement over prior systems hampered by the volume and organization of relevant historical data and by temporal setbacks.  The '792 patent's novel system uses guidance elements to calculate a guidance price for a product.  In addition, a margin rule is used to identify certain overrides needing approval.  The override price and guidance price are presented to decision makers to either approve the override or select the guidance price.  Thus, policies are timely and efficiently deployed and businesses are able to protect their sales margins.

138.    The individual claim elements—including guidance elements for calculating guidance price and a margin rule to flag certain overrides—and the claimed combination were not well-understood, routine, or conventional activity before the invention of the '792 patent.  For example, some prior systems relied on pricing guidance and product configuration suggestions developed by an executive committee that may have long expired, leaving a company exposed to lost margins.

139.    During prosecution of the '792 patent, there was no finding by the Patent Office that the claims were directed to an abstract idea or that the claim elements lacked an inventive concept that transformed the abstract idea into a patent-eligible application, or that the recitation of a computer had any bearing on either of those factors.

140.    Defendants have infringed, and continue to infringe, literally and/or through the doctrine of equivalents, one or more claims of the '792 patent, including but not limited to claim 1, pursuant to 35 U.S.C. § 271(a), by making, using, selling, offering to sell, and/or importing within the United States, without authority, certain software products, including the PFX PriceBuilder.

141.    Upon information and belief, the PFX PriceBuilder generates margin sensitive pricing quotations for a customer in an integrated price adjustment system.

142.    Upon information and belief, the PFX PriceBuilder selects at least one product in a selected product set.

143.    Upon information and belief, the PFX PriceBuilder provides pricing data corresponding to the product in the selected product set.

144.    Upon information and belief, the PFX PriceBuilder provides at least one guidance element for the product in the selected product set, wherein the guidance element is margin sensitive.

145.    Upon information and belief, the PFX PriceBuilder calculates, using a computer, a guidance price for the product based upon a guidance element selected from the following: business priorities, business cycle guidance, richness guidance, and deal size guidance, and wherein business cycle guidance is dependent upon stage of business development with the customer, richness guidance is dependent upon feature number and quality for the product, and deal size guidance is dependent upon a magnitude of total value of the pricing data corresponding to the product.

146.    Upon information and belief, the PFX PriceBuilder receives a margin rule, wherein the margin rule includes one of an established value and a Boolean expression.

147.    Upon information and belief, the PFX PriceBuilder receives a value for at least one override of a group of overrides, wherein the group of overrides includes an override price, an override discount and an override margin.

148.    Upon information and belief, the PFX PriceBuilder calculates using the received value of the override, values for remaining overrides of the group of overrides, wherein the remaining overrides are all the overrides excluding the override for which the value was received.

149.    Upon information and belief, the PFX PriceBuilder compares the values for each of the overrides to the margin rule, wherein the values for the override price, the override discount and the override margin which violate the margin rule are flagged.

150.    Upon information and belief, the PFX PriceBuilder presents the guidance price and the override price on a display.

151.    Upon information and belief, the PFX PriceBuilder receives a selection of one of either the override price or the guidance price.

152.    Upon information and belief, the PFX PriceBuilder generates a quotation based upon the selection such that margin sensitive pricing adjustments are incorporated into the quotation.

153.    Defendants' infringement of the '792 patent has been willful and deliberate because Defendants knew or should have known about the '792 patent and their infringement of that patent but acted despite an objectively high likelihood that such acts would infringe the patent. The individuals who developed the PFX PriceBuilder product include former Vendavo employees who – while Vendavo employees, and on behalf of Vendavo, which owns the '792 patent – would have had knowledge of the patent since it issued in July 2002.

154.    As the direct and proximate result of Defendants' conduct, Vendavo has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Vendavo's remedy at law is inadequate, Vendavo seeks, in addition to damages, injunctive relief.  Vendavo's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

**SEVENTH CLAIM FOR RELIEF**
**Copyright Infringement under 17 U.S.C. § 101 *et seq.***
**(Against All Defendants)**

155.    Vendavo incorporates by reference each of paragraphs 1 – 60 as though fully set forth herein.

156.    Vendavo is, and at all relevant times has been, the owner of the exclusive rights under the United States Copyright Act in the Price Manager and Profit Analyzer software.

157.    Among the exclusive rights granted to Vendavo under the Copyright Act is the exclusive right to use or license the right to use the Price Manager and Profit Analyzer software to others.

158.    The individuals who developed the PFX PriceBuilder and PFX PriceAnalyzer products include former Vendavo employees who – while Vendavo employees – had access to Vendavo's Price Manager and Profit Analyzer software.

159.    Without Vendavo's authorization, Defendants have created, or are using others to create, the PFX PriceBuilder and PFX PriceAnalyzer products, which have source code that is substantially similar to those of Vendavo's Price Manager and Profit Analyzer software, and have offered the same for sale and sold these goods in the United States.

160.    The foregoing acts of infringement have been willful and intentional, and with disregard or indifference to the rights of Vendavo.

161.    As the direct and proximate result of Defendants' conduct, Vendavo has suffered and, if Defendants' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Vendavo will elect at trial to recover its actual or statutory damages.  Because Vendavo's remedy at law is inadequate, Vendavo seeks, in addition to damages, injunctive relief.  Vendavo's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

**EIGHTH CLAIM FOR RELIEF**
**Unfair Competition**
**(Against All Defendants)**

162.    Vendavo incorporates by reference each of paragraphs 1 – 60 as though fully set forth herein.

163.    The California Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, et seq., defines unfair competition to include "any unlawful, unfair, or fraudulent business act or practice."

164.    Pursuant to the UCL, any person who, as a result of unfair competition has suffered injury in fact and lost money or property may bring an action for relief.  The UCL also states that a court may enjoin acts of unfair competition, issue declaratory and other equitable relief, and order restitution of money or property acquired by means of unfair competition.

165.    Defendants engaged in unlawful conduct, in violation of both California and federal laws.  In particular, Defendants violated the Defense of Trade Secrets Act as alleged above.

166.    While employed with Vendavo, Michal Imrisek and Michal Rychtar pursued employment outside of Vendavo that created a direct conflict of interest with Vendavo's business. Michal Imrisek and Michal Rychtar purposefully concealed information related to their employment at PFX while still employed by Vendavo.

167.    PFX interfered with the employment of both Michal Imrisek and Michal Rychtar with Vendavo by directly inducing each to leave Vendavo's employ and work for PFX, a direct

competitor.  In addition, PFX solicited both Imrisek and Rychtar to do work for PFX while they were still employed by Vendavo.

168.    Defendants' acts and practices as described in the preceding paragraphs violated both the unlawful and unfair prongs of the UCL.

169.    As a direct and proximate result of the aforementioned acts, Defendants received and continue to utilize improperly obtained proprietary information belonging to Vendavo, which accelerates PFX's ability to go to market with products similar to and competing with Vendavo's Price Manager and Profit Analyzer software.

170.    Defendants' unlawful conduct alleged herein is continuing and there is no indication that Defendants will refrain from continuing such activity in the future. Defendants will continue such wrongful conduct, in violation of California law, unless enjoined.

## **PRAYER FOR RELIEF**

171.    WHEREFORE, Vendavo respectfully requests that the Court enter judgment against Defendants as follows:

1.  That the Court issue temporary, preliminary and permanent injunctive relief against Defendants, and that Defendants, their officers, agents, representatives, servants, employees, attorneys, successors, and assignees, and all others in active concert or participation with Defendants be enjoined and restrained from:

    a.   infringing Vendavo's patents;

    b.   infringing Vendavo's copyrights;

    c.   misappropriating Vendavo's trade secrets;

    d.   assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs a through c.

2.  That the Court find Defendants have infringed the '814, '198, '421, '598, and '792 Patents.

3.  That the Court award Vendavo all damages caused by Defendants' unlawful actions;

4.  That the Court award Vendavo its actual damages;

5. That the Court award Vendavo pre-judgment interest and post-judgment interest at the maximum rate allowed by law, including an award of prejudgment interest, pursuant to 25 U.S.C. § 284, from the date of each act of infringement of the '814, '198, '421, '598, and '792 Patents by Defendants to the day a damages judgment is entered, and a further award of post-judgment interest, pursuant to 28 U.S.C. § 1961, continuing until such judgment is paid, at the maximum rate allowed by law;

6. That the Court order an accounting for damages through judgment and post-judgment until Defendants are permanently enjoined from further infringing activities;

7. That that Court declare this to be an exceptional case pursuant to 35 U.S.C. § 285;

8. That the Court award Vendavo supplemental damages for any continuing post-verdict infringement up until Defendants are permanently enjoined from further infringing activities;

9. That the Court award Vendavo a compulsory future royalty in the event that an injunction is not awarded;

10. That the Court award Vendavo treble damages as provided by law;

11. That the Court award Vendavo all gains, profits, and advantages derived by Defendants from their unlawful acts;

12. That the Court award Vendavo its actual or statutory damages of up to $150,000, for each registered copyright Defendants infringed, as Vendavo may elect at trial;

13. That the Court enter an award of all just an appropriate restitution;

14. That the Court enter an award of punitive damages as provided by law;

15. That the Court award Vendavo its attorney's fees and all other costs associated with this action; and

16. That the Court grand Vendavo all other relief to which it is entitled and such other additional relief as is just and proper.

///

///

///

## **JURY DEMAND**

Vendavo demands a trial by jury on all issues so triable.

Respectfully submitted,


Dated:   April 5, 2018                          By:   */s/ L. Scott Oliver*
                                                      L. Scott Oliver
                                                      Lillian J. Mao
                                                      ORRICK, HERRINGTON & SUTCLIFFE LLP

                                                      *Attorneys for Plaintiff, Vendavo, Inc.*

AMENDED COMPLAINT